## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ANDREW GILES, Individually and on
Behalf of All Others Similarly Situated,

          Plaintiff,

   v.

BNC BANCORP, THOMAS R.
SLOAN, JAMES T. BOLT JR.,
ABNEY S. BOXLEY III, RICHARD D.
CALLICUTT II, JOSEPH M.
COLTRANE, JR., CHARLES T.
HAGAN III, ELAINE M. LYERLY,
MATTHEW WALSH MCINNIS, W.
SWOPE MONTGOMERY, JR., LENIN
J. PETERS, JOHN S. RAMSEY, JR.,
THOMAS R. SMITH, ROBERT A.
TEAM, JR., G. KENNEDY
THOMPSON, D. VANN WILLIFORD,
RICHARD F. WOOD, and PINNACLE
FINANCIAL PARTNERS, INC.,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a)
AND 20(a) OF THE SECURITIES
EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff Andrew Giles ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.    This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of BNC Bancorp ("BNC" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with BNC, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the

- 1 -

"Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger between BNC and Pinnacle Financial Partners, Inc. ("Pinnacle") (the "Proposed Merger").

2. On January 22, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive 0.5235 shares of Pinnacle common stock for each share of BNC stock they own (the "Merger Consideration").

3. On May 3, 2017, in order to convince BNC shareholders to vote in favor of the Proposed Merger, Defendants authorized the filing of a materially incomplete and misleading Joint Definitive Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The BNC shareholder meeting on the Proposed Merger it is scheduled for **June 12, 2017** (the "Vote").

4. While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

5. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company and Pinnacle; (ii) the

- 2 -

valuation analyses performed by financial advisors, Sandler O'Neill & Partners, L.P. ("Sandler O'Neill"), BSP Securities, LLC ("BSP"), and Keefe, Bruyette & Woods, Inc. ("KBW"), in support of their respective fairness opinions; (iii) the fees Sandler O'Neill and BSP stand to receive in connection with the Proposed Merger; and (iv) conflicts of interest faced by BNC's directors.

6.    It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.    For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to BNC shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) BNC maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, an BNC shareholder.

12.     Defendant BNC is a bank holding company under the laws of the United States, incorporated under the laws of the State of North Carolina to serve as a one-bank holding company of BNC Bank. BNC's only business at this time is owning BNC Bank and its primary source of income is any dividends that are declared and paid by BNC Bank on its capital stock.

- 4 -

13.     Individual Defendant Thomas R. Sloan ("Sloan") has serves as Chairman of the Board since June 2006.

14.     Individual Defendant Richard D. Callicutt II ("Callicutt") serves as a director, President, and Chief Executive Officer ("CEO") of BNC.

15.     Individual Defendant James T. Bolt Jr. ("Bolt") has served as a director of BNC since December 2012.

16.     Individual Defendant Abney S. Boxley III ("Boxley") has served as a director of BNC since 2003.

17.     Individual Defendant Joseph M. Coltrane, Jr. ("Coltrane") has served as a director of BNC since 2002.

18.     Individual Defendant Charles T. Hagan III ("Hagan") has served as a director of BNC since 2006.

19.     Individual Defendant Elaine M. Lyerly ("Lyerly") is the majority shareholder.

20.     Individual Defendant Matthew Walsh McInnis ("McInnis") has served as a director of BNC since 2016.

21.     Individual Defendant W. Swope Montgomery, Jr. ("Montgomery") has served as a director of BNC since 2002.

22.     Individual Defendant Lenin J. Peters ("Peters") has served as a director of BNC since 2002.

23.     Individual Defendant John S. Ramsey, Jr. ("Ramsey") has served as a director of BNC since 2012.

24.     Individual Defendant Thomas R. Smith ("Smith") has served as a director of BNC since 2002.

25.     Individual Defendant Robert A. Team, Jr. ("Team") has served as a director of BNC since 2002.

26.     Individual Defendant G. Kennedy Thompson ("Thompson") has served as a director of BNC since 2009.

27.     Individual Defendant D. Vann Williford ("Williford") has served as a director of BNC since 2002.

28.     Individual Defendant Richard F. Wood ("Wood") has served as a director of BNC since 2002.

29.     All parties identified in paragraphs 13 through 28 are collectively referred to herein as the "Individual Defendants" or the "Board".

30.     Defendant Pinnacle is a financial holding company under the laws of the United States and a Tennessee corporation. Pinnacle is the parent company of Pinnacle Bank, a Tennessee state-chartered bank, and owns 100% of the capital stock of Pinnacle Bank.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of BNC (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

32.     This action is properly maintainable as a class action because:

a.      The Class is so numerous that joinder of all members is impracticable. As of March 31, 2017, there were approximately 52.2 million shares of BNC common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public shareholders of BNC will be ascertained through discovery;

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)      whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

- 7 -

iii)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

- 8 -

## SUBSTANTIVE ALLEGATIONS

**I.    The Merger Consideration Appears Inadequate in Light of BNC's Recent Financial Performance and Growth Prospects**

33.    The Merger Consideration appears inadequate in light of the Company's recent financial performance and prospects for future growth. Indeed, on April 17, 2017, the Company reported first quarter net income of $14.4 million and profits of 28 cents per share. Additionally, BNC increased operating net income, return on average assets, return on average tangible common equity, and originated loans compared to the fourth quarter of 2016

34.    Further, the Company's shares have increased approximately 38% over the previous year, as reflected in the chart below:



35.    In sum, it appears that BNC is well-positioned for financial growth, and that the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the

Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

## II.    The Merger Agreement's Deal Protection Provisions Deter Superior Offers

36.    The Individual Defendants have also agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for BNC.

37.    First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for BNC shareholders. The Merger Agreement states that the Company and the Individual Defendants will not (1) solicit, initiate, knowingly facilitate or knowingly encourage (including by way of furnishing information or assistance), or take any other action designed to solicit, initiate, facilitate or encourage any inquiries or the making of any proposal that constitutes, or is reasonably likely to lead to, any acquisition proposal; (2) participate in any discussions, negotiations or other communications regarding any acquisition proposal; (3) except in connection with and after making a BNC adverse recommendation change, make or authorize any statement, recommendation or solicitation in support of any acquisition proposal; or (4) provide any confidential or nonpublic information to any person relating to any acquisition proposal with such party.

38.    Additionally, the Merger Agreement grants Pinnacle unfettered access to

confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid.

39.     The non-solicitation and notification provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Pinnacle can easily foreclose a competing bid. As a result, these provisions unreasonably favor Pinnacle, to the detriment of BNC's public shareholders.

40.     Lastly, the Merger Agreement provides that BNC must pay Pinnacle a termination fee of $66 million in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal. The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide BNC shareholders with a superior offer.

41.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

42.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that BNC's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

## III. The Materially Incomplete and Misleading Proxy

43. On May 3, 2017, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

44. First, the Proxy fails to disclose the after-tax free cash flows and distributable cash flows that BNC is forecasted to generate. Such projections were specifically based on the Company's forecasts and were relied upon by KBW in connection with their valuation analyses. Proxy 76. Under sound corporate finance theory, BNC shareholders would find such cash flow projections material in assessing the fairness of the Merger Consideration. The omission of the cash flow projections renders the projections set forth in the Proxy materially incomplete and misleading. If a proxy discloses projections, such projections must be complete and accurate.

45. The Proxy also omits certain key inputs necessary for shareholders to assess the valuation analyses performed by Sandler O'Neill and BSP in support of their fairness opinion, rendering the summaries of such analyses in the Proxy incomplete and misleading.

- 12 -

46. With respect to the Net Present Value Analysis of Pinnacle and BNC, the Proxy fails to disclose Sandler O'Neill's and BSO's basis for selecting price-to-2020 earnings per share multiples ranging from 19.0x to 24.0x and price-to-December 31, 2020 tangible book value per share multiples ranging from 230% to 280% to derive the Company's terminal values. Further, although the Proxy discloses that Sandler O'Neill and BSP selected discount rates ranging from 10.0% to 13.0%, which were "chosen to reflect different assumptions regarding required rates of return of holders or prospective buyers of BNC common stock," the Proxy fails to disclose those underlying assumptions and inputs to derive the discount rates.

47. With respect to the Pro Forma Merger Analysis, the Proxy indicates that, in arriving to its conclusion in this analysis, Sandler O'Neill and BSP utilized "certain assumptions relating to purchase accounting adjustments, cost savings and transaction expenses, as provided by the senior management of Pinnacle." The Proxy, however, fails to disclose these assumptions, which form the basis of Sandler O'Neill's and BSP's analysis.

48. With respect to KBW's Discounted Cash Flow Analysis, the Proxy fails to disclose the inputs and assumptions underlying the calculation of the discount rate range of 9.0% to 12.0% used by KBW.

49. These key inputs are material to BNC shareholders, and their omission renders the summary of KBW's Discounted Cash Flow Analysis incomplete and

Case 1:17-cv-00482-WO-JLW   Document 1   Filed 05/25/17   Page 13 of 24

misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion <u>unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices</u>. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions. *Id.* at 1577-78.

50. With respect to all Selected Companies Analyses and Selected Transactions Analyses, the Proxy fails to disclose the individual multiples calculated for each company and transaction utilized. The omission of the individual multiples for each company and transaction renders the summary of these analyses and the implied per share equity value reference ranges materially misleading. A fair summary of a Selected Companies Analysis

and Selected Transactions Analysis requires the disclosure of the individual multiples for each company and transaction; merely providing the range that a banker applied is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

51.     The Proxy also fails to disclose the amounts of Sandler O'Neill's and BSP's fees that are contingent upon the completion of the Proposed Merger, which is material for stockholders to determine whether Sandler O'Neill's and BSP's fairness opinion was improperly influenced by its desire to ensure that the Proposed Merger is consummated. The assertion that "a substantial portion" of their fees is contingent upon the completion of the Proposed Merger is inadequate to allow stockholders to properly assess whether their analysis was improperly influenced by their desire to ensure that the Proposed Merger is consummated. Indeed, determining what constitutes a "substantial portion" is highly subjective and open to various interpretations. Thus, without specifying the percentage or dollar value of the fee that is contingent, stockholders are unable to determine whether the percentage of the fee that is contingent exceeds both common practice and common understanding of what constitutes "substantial." It is imperative for stockholders to be able to understand what factors might influence a financial advisors' analytical efforts, and the omission of such information renders the vague reference to the

contingent nature of Sandler O'Neill's and BSP's fees incomplete and therefore misleading.

52.     Lastly, while the Proxy notes that "directors and executive officers of BNC have certain interests in the merger that may be different from, or in addition to, the interests of BNC shareholders generally" Proxy 97, Defendants have failed to quantify the payments and benefits that all of BNC's directors stand to receive if the Proposed Merger is consummated. Instead, the Proxy only quantifies the expected payments the Company's named executive officers are expected to receive. *Id.* at 100-102. However, the Company's directors will each have their restricted stock awards immediately vest upon the consummation of the Proposed Merger, and BNC shareholders would undoubtedly find it material to know the value of each of the Individual Defendants' restricted stock upon the consummation of the Prosed Merger. Given that each of the Individual Defendants has approved the Proposed Merger and recommended that the Company's shareholders vote in favor of the transaction, it is imperative that the Company's shareholders fully understand the financial interests and conflicts of interest each of the Individual Defendants faced. The omission of this information renders the section "Interests of BNC's Directors and Executive Officers in the Merger" incomplete and therefore misleading.

53.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder

- 16 -

meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

54.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

55.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

56.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17

- 17 -

C.F.R. § 240.14a-9.

57. The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

58. Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company and Pinnacle; (ii) the valuation analyses performed by financial advisors, Sandler O'Neill & Partners, L.P. ("Sandler O'Neill"), BSP Securities, LLC ("BSP"), and Keefe, Bruyette & Woods, Inc. ( "KBW"), in support of their respective fairness opinions; (iii) the fees Sandler O'Neill and BSP stand to receive in connection with the Proposed Merger; and (iv) conflicts of interest faced by BNC's directors.

59. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they

could have done so without extraordinary effort.

60. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that Sandler O'Neill and BSP reviewed and discussed their financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Sandler O'Neill and BSP as well as their fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had to have knowledge of the projections for the Company and Pinnacle and knew or should have known of the conflicts faced by Sandler O'Neill each of the Company's directors that have been inadequately disclosed in the Proxy.

61. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review Sandler O'Neill's and BSP's analyses in connection with their receipt of the fairness opinion, question Sandler O'Neill and BSP as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that

there are no material misstatements or omissions.

62. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

63. BNC is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

64. Further, Pinnacle was directly responsible for the preparation of certain sections of the Proxy, including the incomplete and misleading sections summarizing its projections and the valuation analyses performed by its bankers, and was negligent in allowing the Proxy to be disseminated to BNC's shareholders with incomplete and misleading information contained therein. Pinnacle permitted the use of its name in the Proxy to solicit BNC's shareholders to vote in favor of the Proposed Merger.

65. The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed

- 20 -

Merger.

66.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

67.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

68.     The Individual Defendants acted as controlling persons of BNC within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of BNC, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

69.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

71.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

72.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

73.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

74.     Plaintiff and the Class have no adequate remedy at law. Only through the

exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 25, 2017

OF COUNSEL

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, New York 10118
Tel: 212-971-1341
Fax: 212-202-7880
Email: jmonteverde@monteverdelaw.com

**FARUQI & FARUQI, LLP**
James M. Wilson
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331
Email: jwilson@faruqilaw.com

*Counsel for Plaintiff*

Respectfully submitted,

**WARD BLACK LAW**

/s/ Janet Ward Black
Janet Ward Black
NC State Bar 12869
Nancy Meyers
NC State Bar 23339
208 West Wendover Ave.
Greensboro, North Carolina 27401-1307
Tel.: (336) 333-2244
Fax: (336) 379-9415
Email: jwblack@wardblacklaw.com
        nmeyers@wardblacklaw.com